WESTINGHOUSE ELECTRIC & MFG. CO. v. CUTTER ELECTRICAL &
MFG. CO.

(Circuit Court of Appeals, Third Circuit.  February 27, 1906.)

No. 38.

PATENTS—INFRINGEMENT—AUTOMATIC ELECTRIC CIRCUIT BREAKER.

The Wright & Aalborg patent, No. 633,772, for an automatic electric circuit breaker, claims 2 and 5, construed, and *held* not anticipated, but to disclose patentable novelty and utility; also *held* infringed.

Gray, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 136 Fed. 217.

Thomas W. Bakewell, Thomas B. Kerr, and Wesley C. Carr, for appellant.

Joseph C. Fraley, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge.  This was a suit in equity brought by the Westinghouse Electric & Manufacturing Company against the Cutter Electrical & Manufacturing Company, for infringement by the defendant of letters patent No. 633,772, granted on September 26, 1889, to the complainant, as assignee of Gilbert Wright and Christian Aalborg, the inventors.  The invention relates to devices employed for automatically opening electric circuits, when the current passing therethrough is materially in excess of that which the circuit is intended to carry.  The specification states the object of the invention thus:

"The object of our invention is to provide a circuit-breaker that shall have a large current-carrying capacity in proportion to the mechanical dimensions of the device, which shall be easily brought into operative position and locked therein, which shall be certainly and quickly opened whenever the current in the circuit exceeds that for which the locking mechanism is set, and which shall serve to interrupt the circuit without danger of injury to the main contact terminals."

The bill charges infringement of the second and fifth claims of the patent, which are as follows:

"(2) In an automatic electric circuit-breaker, the combination with a base and stationary main and shunt contact-terminals located in approximately vertical alignment thereon, of a movable laminated contact member pivoted to said base, a movable shunt-contact member pivoted to said laminated contact member, toggle-levers for operating said movable members, means for locking the breaker in closed position, and a tripping device projecting into a magnetic circuit."

"(5) In a circuit-breaker, the combination with main stationary contact-terminals and a stationary shunt-terminal located above the same, of a pivoted main contact member, a shunt-contact member pivoted to said main member at a distance from its axis of movement, means for yielding holding the movable shunt-contact in a position in advance of the plane of the faces of the main movable member when in open position, toggle-lever mechanism for closing the breaker, a latch and electromagnetically-actuated means for tripping the latch; said toggle-lever latching the tripping mechanism being located below both the main and the shunt separable terminals."

We here insert, as illustrative of the circuit breaker in closed position of the patent in suit, figure 1 of the patent drawings:

We extract from the specification some paragraphs descriptive of the apparatus and its mode of operation:

The main movable contact member, 9, of the circuit-breaker consists of a body of thin copper plates of curved form rivited or otherwise fastened together, but having free ends which are beveled with reference to the body portions of the laminæ, so that when the circuit-breaker is closed or nearly closed, they are in a plane that coincides with or is parallel with the plane of the faces of the stationary contact-terminals, 2 and 3. A thicker plate, 10, of greater length than any of the main laminæ is riveted to said main laminæ and is of such form and dimensions that its upper end makes contact with the plate, 6, on the face of the upper stationary contact-

terminal, 2, when the circuit-breaker is closed, and its lower end is permanently in engagement with the face of terminal, 3. The member, 9, is rigidly fastened by any suitable means, such as bolts or rivets, to the upper end·of a supporting frame, 11; the lower end of such frame being bifurcated and pivoted between the brackets, 3 at 12. Pivoted between the arms of frame 11 is one arm, 13, of a toggle-lever, 14; the other arm, 15, of such lever being part of a casting, 16,. which is provided with an operating-handle, 16ª. The casting, 16, is mounted upon rod 16ᵇ, which is supported by the outer ends of brackets 8. The arms 13 and 15 of the toggle-lever, 14, are so located and proportioned with reference to the brush-contact member, and the contact-terminals 2 and 3, that the former will be brought to its closed or operative position by a degree of movement that falls a little short of bringing the centers of the three pivots of the toggle-lever into alignment; this adjustment being desirable in order that, when the movable member of the breaker is released, the toggle-joint may act readily and quickly under the action of the opening means to be hereinafter described."

"The movable shunt-contact member comprises a block, 17, of carbon or other substantially infusible conducting material mounted in a suitable metal frame, 18, and having a. metal plate, 19, the face of which constitutes a continuation of the face of the infusible block, 17, so as to engage with the face of the plate, 6, on the stationary terminal when the circuit-breaker is closed. This frame, 18, carrying the infusible block, 17, is pivoted between two arms, 20, a spring, 21, being fastened to said frame and extending downward, so as to bear against a cross-piece or other suitable stop, 22, and thus tend to throw the upper end of the block, 17, inward slightly toward the co-operating stationary block, 5. The two arms, 20, are pivoted to the upper end of the frame, 11, at a point corresponding to the middle of the member, 9, and project downward beyond this point to corresponding points between the pivot, 12, and the point at which the toggle-lever arm, 13, is pivoted to frame 11."

"The operation of the circuit-breaker is as follows: Assuming that the breaker is in open position, arms 20 will be held against the stops, 20ª, on frame 11 by the coiled springs, 23, and the other parts will be in the position indicated in Fig. 3. The operator will now grasp the handle and press downward upon it, thus moving the toggle-joint upward, and at the same time carrying the laminated contact member inward toward the stationary terminals; the shunt-terminals and its supporting-arms being carried with the laminated contact member, so that the shunt terminals will be first brought into engagement, and thereafter the movable terminal will slide on the stationary terminals and thus tend to keep it clean and make good contact. As the movement is continued until the toggle-lever pivots are brought nearly into alignment, both the shunt-terminals and the main terminals will be brought into close engagement; the ends of the laminæ of the latter being deflected sufficiently to make good contact with the faces of the terminal blocks. When this final position is reached, the frame, 28, and its weight acting through the projection, 31, on the lower end of the latch, 27, will cause the notched end of the latter to engage the roller, 26, and thus hold the parts in this locked position. If the ·current through the circuit-breaker exceeds the amount for which it is set by the adjustment of the weight, 33, in its frame, such current will produce a magnetic flux through the body, 7, of the magnetizable material, which will have sufficient strength to draw the armature, 20, inward and downward. When this action. takes place, the projection, 30, in the frame, 28, strikes against the latch and throws its recessed or notched end upward away· from the roller, 26, whereupon the coiled springs, 23, will throw the toggle-joint downward, and, supplemented by the action of gravity, will throw the circuit-breaker completely open. The laminated contact member will obviously first leave the stationary terminal, 2. Hence the current will be shunted through the strips, 10 and 25, and the carbon blocks; the final interruption being affected by the separation of the blocks. By reason of interrupting the circuit at a single point—that is, making a single break and locating that break above the main terminals—the resulting arcs cannot by any possibility do any damage to the circuit-breaker; they being broken upward at a single point and away from all of the metal parts of the device."

In support of the defense of lack of patentable novelty, the defendant has put in evidence over 60 prior patents. We fail, however, to discover that any of these prior patents contains all the elements of either of the claims here in suit. We are entirely satisfied from the proofs that these claims (2 and 5) show patentable novelty and utility. While the invention of Wright and Aalborg was not a primary one, we think it was a distinct advance upon the prior art, producing new and valuable results.

The defendant's circuit-breaker alleged to infringe is illustrated, in closed position, by the following cut:

The complainant company maintains that the defendant's circuit-breaker has all the elements of the second and fifth claims of the patent in suit, namely, a base, 3, stationary main contact-terminals, 1 and 2, a stationary shunt contact-terminal, 13, located in approximately vertical alignment on the base, a movable laminated contact-member, 4, pivoted at 6 to the base, a movable shunt contact-member, 15, pivoted at 16 to the laminated contact-member, toggle-levers, 9, 10, for operating the movable members, means, 23, for locking the breaker in closed position, and a tripping device, 25, projecting into a magnetic circuit, and that in other particulars the defendant's device conforms to the description of claim 5; the shunt contact-member, 15, being pivoted, at 16, to the main member at a distance from its axis of movement, and the spring, 17, being the means for yieldingly holding the movable shunt-contact in a position in advance of the plane of the faces of the main movable member when in open position.

The defendant, however, contends that its circuit-breaker lacks the element, "a movable shunt-contact member, pivoted to said laminated contact-member," of claim second of the patent in suit, and also lacks the element, "a shunt-contact member pivoted to said main member at a distance from its axis of movement," of claim 5 of the patent in suit. This contention is based upon the opinion of the defendant's expert as to the meaning of the above-quoted language of these claims, a point upon which the experts upon the one side and the other differ. The position of the defendant's expert is that the language used in claims 2 and 5 requires the pivoting of the shunt-contact member to the laminated contact or main member at the point marked B on the above drawing of the complainant's patented device. Thus the defendant's expert testifies: "The movable shunt-contact member referred to in claim 2 means the movable carbon block, 17, along with its supporting arms, 20." And again he says: "In view of these facts, the pivot, referred to in claim 2 as joining the movable shunt-contact member to the laminated contact member, must refer to the pivot, B, and to no other." And referring to claim 5 he testifies: "The pivot of the shunt-contact member referred to in claim 5 is the pivot, B." He further testifies that this pivot, B, is absolutely wanting in the defendant's structure.

We are not able to give to the claims 2 and 5 the limited meaning contended for by the defendant. Certainly nothing is expressed to restrict these claims to a pivoting at the point B. The language used is satisfied by the pivoting of the shunt-contact member at the point A, and the shunt-contact member cannot be said any more truly to be pivoted to the laminated contact member or main member by a pivotal connection at B, than by a pivotal connection at A. Moreover, we think it clearly appears that the pivotal connection at A is essential to the practical operation of the patented apparatus, and therefore the construction of the claims 2 and 5 should be such as to include this indispensable feature. The function of the movable carbon block is not simply the adjustment of contact between the carbons 17 and 5, but also to permit the main contact to close after the carbon contacts are closed, and to open before the carbon contacts are opened.

Furthermore, the interpretation on which the defendant insists brings into claims 2 and 5 as an element the pivoted arm, 20, which is expressly made an element of claims 1 and 3, but which was omitted from claims 2 and 5 and presumably was intentionally so omitted.

Turning to the defendant's circuit-breaker, we find that the movable carbon block (15) is pivoted directly to an arm forming an upward extension of the main movable laminated contact member. The defendant, however, insists that it has wholly dispensed with the pivotal connection of the long arm, 20, of the patent in suit with the laminated contact-member, and thus has eliminated from its structure the loose and yielding connection at point B. Is this so? As we have seen, the movable laminated contact member of the defendant's apparatus is pivoted to the base, and the pivot, 6, it is shown, moves in a slot, 7, thereby affording loose motion to the laminated contact member independent of the motion of the carbon shunts. Now, in answer to the question, "Will you please state the functions of the slot marked 7 in your cut A of the defendant's circuit-breaker?" the defendant's expert replied:

"The function of the slot marked 7 in the cut A is to permit a motion of translation of the pivot, 6. This permits a motion of translation of the laminated member, 4, before its simple motion of rotation about pivot, 6, during the opening of the switch."

And the witness further states that:

"In closing defendant's circuit-breaker the carbons come first into engagement and then, by a motion of translation, permitted by the slot, 7, the main laminated member and the movable carbon move together toward their respective complimentary contacts; after the carbons have once touched in the closing movement they continue in engagement."

Obviously the two devices for securing loose motion to the laminated contact-member independent of the motion of the carbon shunts are equivalent mechanical arrangements.

But, in support of the defense of noninfringement, the defendant further contends that there is no combination in its apparatus of stationary main and shunt-contact terminals located in approximately vertical alignment. It seems to us, however, in view of the purpose to be subserved and function to be performed, that these parts are in vertical alignment in any practical sense. They are in line with each other, and one above another in a vertical direction. Whatever difference in alignment in this regard there may be between the complainant's apparatus and that of the defendant is immaterial for practical purposes. With reference to function the defendant's contact, we think, is in approximately vertical alignment upon any fair reading of the patent in suit.

Again, it is contended by the defendant that its device differs from that of the complainant, by reason of the absence of means for yieldingly holding the movable shunt-contact in a position in advance of the plane of the faces of the main movable member when in open position. The arrangement of the patented apparatus is one which permits the surfaces of the carbon contact to meet in advance of the meeting of the main contact surfaces, and to break contact last. Now, whilst the defendant's device does not employ precisely the arrange-

ment described in the patent, the purpose to be attained is accomplished by the defendant in substantially the same way. The defendant's movable shunt terminal is set back, but the stationary companion terminal is set correspondingly forward. That the complainant pivots only one of its carbons, while the defendant pivots both of them, is an immaterial difference. Either one or both may be pivoted to secure the desired yielding and turning motion.

Upon the whole case we are of opinion that there is substantial identity of operation between the complainant's and the defendant's devices, accomplished by substantially the same means and securing the same results. We think, therefore, that the court below should have entered a decree in favor of the complainant upon the second and fifth claims of the patent in suit.

We have not overlooked the argument based upon the contents of the file wrapper. We are not able, however, to find anything therein inconsistent with the interpretation which we have given to claims 2 and 5 of the patent in suit. Claim 2 stands as originally formulated, save by the insertion of the word "located" after "terminals," and the word "approximately" before "vertical alignment." Claim 5 was not amended so as to include the long arm, 20, or with reference to it at all. The changes made in that claim do not touch the controlling questions before the court.

The decree of the Circuit Court is reversed, and the cause is remanded to that court, with instruction to enter a decree in favor of the complainant upon claims 2 and 5 of the patent in suit, in accordance with the views expressed in this opinion.

GRAY, Circuit Judge, dissents.